Before we begin, I'd like you to take two minutes for a moment to valor this. Your honors, there are three points I'd like to discuss with you today. The first is whether the court's holding subsequent to the petitioner's hearing before the immigration court qualifies a changed circumstance which would require the court to remand this case to use an asylum application and conduct a formal petition to the one in the bar. The second point, your honors, is whether this court should revisit determination of whether Christians in Indonesia qualify as a disfavored group for asylum and withholding approval analysis. And the third is whether this court should also revisit whether there is a pattern of practice of persecution of Christians. When you say we should revisit, I think that there's authority already that they are a disfavored group. Well, I would agree. Well, there are. So aren't you happy to hear that? Oh, I am happy to hear that, your honor. If they are a disfavored group, then, your honors, what I would say is that both the immigration court and the BIA err in determining there's not substantial evidence of the petitioner demonstrating individualized risk. Okay, what's the next point? Pardon, your honor? What's the next point you want to make? Well, that there's also a pattern in practice of, well, I'm sorry, your honor. Within the second point is that the BIA and the immigration court then mystified the law. It should have granted the individual, if not asylum, at least withholding of removal, or it could have determined there were a change of circumstance, could have and should have granted him asylum. Well, tell us exactly what happened to him that would constitute persecution. Well, your honor, there were three incidents which the individual indicated. One, of course, when he was young, involved his aunt. His aunt married a Muslim who then converted to Christianity, and then as a result of it, lost his job. But that's nothing that happened to him. No, your honor. What happened to him is that he was in a church that was attacked. He was in a church. In 1995, he was in a church with his uncle. That church was stoned. That church was stoned, and also the uncle's car was damaged as a result of the attack. In 1992, he also was basically had an encounter with Muslims when he was wearing a, when he was outside wearing his, wearing a leather cross. And basically, it was ripped off his neck, and he was told not to wear it. And so, of course, the... His neck. Yes. He ripped it off his neck. Yes. So, your honor, these incidents, coupled with what's happened, what happened to his aunt, the persecution she suffered, or her husband, coupled with the many incidents of actions against any number of Christians in Indonesia, whether it comes to church foreclosures, additionally provided ample evidence of activities that were taken against many Christians. Even in the, even in the country report that was submitted, there was also an indication that there was also an admission that many churches have been closed in Indonesia. This, this court previously has in Avitoba, ISIL versus INS, has said that past threats of violence can establish, may establish individual risk, even if they do not rise to the level of persecution. In addition, this court has also found that there's a persecution in, in, in Hartuni versus INS. The one after 336, in that case, there was also a situation, one of the incidents where Hartuni's church was stoned. Now, of course, in that case, it was stoned by soldiers, but, but nonetheless, still you have a situation where you have Muslim stoning churches, stoning Christian churches. What's in the record about current circumstances? Does he have a reasonable fear now? Well, what, what are the circumstances in Indonesia? Well, Your Honor, well, Your Honor, based on, Your Honor, we did submit some exhibits with a supplemental, with our supplemental brief, which were, which were unfortunately stricken, in which we attempted to show more recent events, recent activities in Indonesia. Since that, that time, of course, there, there have been more church foreclosures. There have been situations, of course, I'm not sure if Your Honors have heard in other cases, but situations where students have been beheaded for something to do with Christians. And what's happened to them? There were, perhaps a couple of years ago, there were three Christian students that were beheaded simply for attending Christian school. There have been, there have been schools that have been closed. In addition, I believe there, and I, I don't have the document, but there, there, there have been teachers who have been imprisoned for simply, simply being accused of teaching Christianity to Muslims, or I guess, I guess arguing that they were proselytizing to Muslims. So, the circumstances, and frankly, the circumstances now are that although there may be, there may be a response act, but the government does not actively take any action or does not do anything to, to harm Christians. Basically, for the individual in Indonesia, for the individual Christian, they cannot openly, they cannot openly show their faith if, if they, if they tend to, they tend to stay away from going out as much as possible, unless, unless it's something involving work or going to their church, because they can be recognized easily as Christians in actions, and there is never, there is never any day where, where they can walk the streets and not worry about perhaps some Muslims attacking them if they don't, if they show any, any way that they're Christian, if they do anything. Activities that we take for granted here in the United States. There's not a good place to leave. Do you want to say a few final words? Yes. Thank you. May it please the Court, Kristen Edison on behalf of the Attorney General. First, I wanted to thank the Court for accommodating my schedule. I'd like to return to the discussion about the disfavored group analysis and just point out at first that Petitioners are ethnically. It's hard to hear you. I apologize, Your Honor. Returning to the disfavored group analysis, I just wanted to point out that Petitioners are not ethnically Chinese. They are Indonesian. These cases are rather interesting because we've had several cases involving Chinese Christians, and apparently the two before us today are not, not Chinese. That's correct, Your Honor. So, Sale, then, is distinguishable from this case. In Sale, the Court, of course, found that the... you're Chinese and you're persecuted in Indonesia. You're better off than a Christian who's Indonesian. Well, Your Honor, in Sale, the Court pointed out that the longstanding discrimination and harassment against Chinese Christians... Is the distinction on the ground in the real world that people who are not ethnically Chinese but who happen to be Christian are less visible in the sense of not distinguishable from anybody else on the street? So is that your argument?  Well, I'm not asking about this. It's a more general question, which is whether they are in, should be considered in a protected group. A disfavored group, Your Honor? Mm-hmm. Well, just, I can only speak to the facts of this case, of course, Your Honor. And I don't think that the record supports that finding in this case. The country conditions reports in this case are from 2002. And they point out, both the State Department report on country conditions and the religious freedom report, that although there's widespread tension, any violent conflicts are localized. Both Christians and non-Christians are involved in the violence. It's not one-sided. There are interfaith groups back in 2002 that were working and were promoted by the government. The government brokered peace accords, and consequently, the violence between ethnic groups, pardon me, between religious groups decreased. I think that that — I don't think Petitioner has pointed to any evidence in this record to show that Christians in Indonesia should be considered a disfavored group. Counsel, something about this case that disturbed me, the only reason that Mr. Pelley was here was because he complied with the request that he go in and register after 9-11. And to have that registration used as a mechanism to identify persons who were here illegally and should be deported seems unfair. Well, Your Honor, Mr. Pelley entered the United States in 1998, and — There's no doubt he entered the country illegally. Right. But he's acted like a very responsible person, had a job, went to church, not involved in any illegal activity at all. And had he not been requested to come in and register, he probably would never have come to the attention of the authorities. That may be, Your Honor. However, Mr. Pelley still was required to apply for asylum within a year of arriving in the United States or to establish an exception. Still he was required to do that if he intended to seek asylum. So even if his asylum application is untimely, which is what the holding was below, would he still have the opportunity for us to consider withholding of removal? Yes, Your Honor. And the government contends that the record doesn't compel the conclusion that Mr. Pelley is eligible for withholding of removal. Again, as Your Honor had pointed out, there's really only one instance of past persecution that he claimed that involved him. That was when his cross necklace was torn off his neck. And the other two incidents, which happened years before and years later, didn't involve him. It involved his family members and didn't happen to him. It could have happened to any bystander. Do you think that the fact of being required to come in and register is a changed circumstance which would excuse his late asylum application? Have you thought about it that way? Well, Your Honor, if that was Mr. Pelley's position, he was required to argue that before the agency, and he did not. The agency hasn't had a chance to consider that claim. Well, the agency doesn't get a chance to hear a fair number of claims that perhaps should have heard and perhaps should have been presented to it because of the way the system is run. And the way the system is overseen, I don't want to say any more because it would probably upset me. You know, there are really two prongs to this. If he's not been able to establish persecution, he can still establish reasonable fear. Now, I hadn't heard about the beheadings. When did these happen? I'd be a little frightened, I think, if some of my Christian friends had gotten beheaded. I understand, of course, Your Honor. However, Petitioner's Counsel unfortunately didn't point to any records that support that contention. Is that accurate, though? Your Honor, I don't – I looked through the record, and I don't believe that the record supports that contention. Well, not the record, but as a matter of fact, did that happen? You know, we can possibly take judicial notice or we can send evidence back, but did it happen? Your Honor, I read the most recent country conditions report and religious freedom report, and I don't believe that those incidences were reported in the report. I just wanted to return to Your Honor's question about persecution and point out that this Court has considered a fair number of cases after sale, including Wackery and Halim, in which the Court has considered similar claims by Indonesian Christians who were also Chinese and found the incidents of persecution that were more severe and more numerous than those that Petitioner experienced did not constitute persecution. In Halim and Wackery, the Court found that the experiences of those Petitioners – Let me ask you, don't we have in the administrative record that the Indonesian government is aware and possibly complicit in torture inflicted on Christians by Muslims? That's at 180 of the record. Religious violence and the lack of an effective government response to punish perpetrators and prevent further attacks continue to lead to allegations that officials are complicit in some of the violence, or at a minimum, allow it to occur with impunity. In 181, the government failed to prevent activities that lasted jihad. A paramilitary group engaged in a crusade against Christians. The military commander ordered troops to destroy Christian separatist movement, urging his men to kill them all if necessary, but failed to take action to force this paramilitary group out of the area. Active duty and retired military personnel participated in or stood by during torture executions of Christians who refused to convert. I've got a pretty good file here in this book. There's a bunch of stuff up there. I understand, Your Honor. On top of that, they're westernized. Now, the Petitioner's sister is an American citizen, and she's filed an application for him. He has, what, he has a little girl who's an American? He was sent her back to Indonesia? She's a Christian? Huh? Well, Your Honor, first I wanted to point out that... Is that what the United States of America is all about? The Statue of Liberty and all the rest of it? I understand, Your Honor, that this case definitely involves sympathetic facts. Well, I mean, has the present Attorney General looked this case over? Does he know about this? I'm happy to take that back to my supervisor, Your Honor, if that's necessary. But I just wanted to point out... Show it to Mr. Osuna. Has he seen it? I'm happy to do that, Your Honor.  He's a good guy. I agree, Your Honor. I did want to point out, though, as I mentioned before, the reports show that the violence is not one-sided, that Muslims are also victims of violence, and the reports that I mentioned earlier also indicate that the government has made progress in addressing violence, a brokered peace accord. And in subsequent cases, such as Wolong II, this court has held that the government has shown commitment to religious freedom. The court has certainly addressed this. Well, who were they targeting when you had that big explosion that went off at a resort where I think the Australians and New Zealanders were there in large groups? A lot of them were killed, huh? Unfortunately, yes. I believe that my time has expired. I have sent any questions to the court. Okay. Thanks. All right. I think we've had enough. No, I think we understand the case. We understand the case. Okay, thanks. I'll take up the next one. Yeah, Wolong versus Holder.
judges: Fletcher B., Pregerson, Graber